Chase, J.
(absent the chief judge,) delivered the following opinion of the court:
The case before the court is acknowledged to be of great importance, and has been fully and ably argued, and they have endeavoured to form a right judgment upon it, after considering it in the best manner they are able.
The court are of opinion that upon the return of an attachment, the defendant cannot appear without bail, if cause of bail appears on the proceeding, and cause of bail must appear, if the act of assembly has been pursued, because there must be proof of the debt before the attachment can issue.
The attachment is to' compel the appearance of the defendant.
When the defendant comes in on the return of the attachment to appear, he is in the same situation he would have been in if taken on a capias ad respondendum, and cannot appear without bail.
For any apparent defect in the proceedings before the court, the attachment may be quashed upon suggestion of such defect to the court, either by the defendant himself, or a third person claiming an interest in the property attached.
Such suggestion calls the attention of the court to the defect appearing upon the proceedings before them®
*553 Before the appearance of the defendant, which cannot be but upon giving bail, which will be a dissolution of the attachment, no evidence is admissible which relates to ' , the merits of the dispute between the parties 1 but the attachment, being a summary proceeding, and not changing its nature until there is an appearance with bail, every fact is cognisable by the court which will show the attachment issued irregularly, or to show the property attached does not belong to the defendant 5 and evidence dehors or extrinsic the proceedings may be lesorted to, and the proof is to be made to the court, because the proceeding is summary, and without the intervention of s jury*
In this case a fact is said to exist which, if material, the defendant could never avail himself of, unless proof is admissible at this stage of the proceeding; that is, that Robert Morris, the defendant, is a citizen of Pennsyhania s and the court are of opinion that proof of that fact can be received on the attachment.
As to the question whether the act of 1795 contravenes the constitution of the United States, and is incompatible with it:
By the second section of the fourth article of the constitution of the United States, the citizens of each state shall- be entitled to all the privileges and immunities of citizens of the several states.
Privilege and immunity are synonymous, or nearly so® Privilege signifies a peculiar advantage, exemption, immunity 1 immunity signifies exemption, privilege.
The peculiar advantages and exemptions contemplated under this part of the constitution, may be ascertained, if not with precision and accuracy, yet satisfactorily.
By taking a retrospective view of our situation antecedent to the formation of the first general government, or the confederation, in which the same clause is inserted verbatim, one of the great objects must occur to every *554 person, which was the enabling the citizens of the several states to acquire and hold real property in any of the states, and deemed necessary, as each state was a sovereign independent state, and the states had confederated only for the purposes of general defence and security, and to promote the general welfare.
It seems agreed, from the manner of expounding, or defining the words immunities and privileges, by the counsel on both sides, that a particular and limited operation is to be given to these words, and not a full and comprehensive one. It is agreed it does not mean the right of election, the right of holding offices, the right of being elected. The court are of opinion it means that the citizens of all the states shall have the peculiar advantage of acquiring and holding real as well as personal property, and that such property shall be protected and secured by the laws of the state, in the same manner as the property of the citizens of the state is protected. It means, such property shall not be liable to any taxes or burdens which the property of the citizens is not subject to. It may also mean, that as creditors, they shall be on the same footing with the state creditor, in the payment of the debts of a deceased debtor. It secures and protects personal rights.
The way to expound a clause in the general government or constitution of the United States, is by comparing it with other parts, and considering them together; and to lay’ a foundation for a right exposition in the present case, it will be proper to suggest a few plain principles.
1st. That congress can exercise no power as a legislative body but what is vested in them by the constitution^ it being under and by virtue of that instrument alone they derive their power.
2d. All power, jurisdiction, and rights of sovereignty, not granted by the people by that instrument, or relinquished, are still retained by them in their several states, *555 ■arid in their respective state legislatures, according to their forms of government.
Uniformity of laws in the states is contemplated by the general government only in two cases, on the subject of bankruptcies and naturalization.
The legislative powers of congress are particularly defined in. the 8th section of the 1st article.
Those powers do not interfere with, or abridge, the power of the states to make local regulations, the operation of which'is confined to the state.
The restrictive clauses in the 10th section of the 1st article, limiting the powers of the states, are confined to certain enumerated cases, none of which comprehend the subject under consideration: the power of regulating process for the more effectual recovery of debts.
A restriction of the power of the state legislatures to establish modes of proceeding for the recovery of debts, is not to be inferred from the clause under consideration.
The mode of proceeding for the recovery of debts, is variant in the several states, and congress, has not established a uniformity of proceeding in the circuit courts, but in each state the proceedings are pursuant to the laws of the state in which the. suit is instituted.
This proceeding by attachment is to compel an appearance, and the attachment, by the defendant’s appearing and giving bail, would be dissolved; and he would be in the same situation with any citizen of this state taken on a capias ad respondendum, who appears and gives bail to the suit, and so will his property.
It would be a strange complaint for a citizen of Pennsylvania to make, that he was not allowed the same immunities and privileges with a citizen of Maryland, which he is informed he may enjoy by conforming to the laws of the state, in appearing and giving bail to the suit commenced against him.
The law of congress, 1789, c. 20. in my opinion, does aot prohibit or discountenance this proceeding, but if any *556 inference can be made the one way or the other, rather warrants it by not allowing the jurisdiction of the state courts to be ousted except where the debt claimed exceeds five hundred dollars, and by the defendant’s complying with certain requisites.
Section 11. gives the circuit courts concurrent jurisdiction with the state courts, in suits between citizens qf different states, where the sum exceeds five hundred dollars.
Section 12. provides for the removal of a suit, brought by a citizen in the state court against a citizen of another state, to the circuit court, if the sum exceeds five hundred dollars, upon petition and giving security to give bail to the suit in the circuit court, if the suit requires bail, and the defendant is at liberty in this case to make his election, and may remove this suit to the circuit court upon complying with the law of congress.
This, then, is the only case in which there is an interference with the original jurisdiction of the state courts as to the recovery of debts.
The latter part of the clause recognises the mode of proceeding 'in some of the states by attachment, as a compulsory process to oblige the party to appear, and allow the party to hold the goods or estate attached to answer the final judgment, in the same manner as by the laws of the state they would have been holden. This law, then, takes notice of the proceeding by attachment, to compel the appearance of the defendant, and warrants it % and the court are of opinion that the act of 1795 does not contravene the constitution, and is not incompatible with it.
As to the question whether the lands, goods and chattels, &c. of the defendant, not in the hands of a third person, are attachable: the court are of opinion the lands, goods' and chattels of the defendant may be attached wherever they are found, within the reach of the process of the state, and may be condemned, unless the de *557 fendant comes in and gives bail, and thereby dissolves the attachment.
The court are also of an opinion that an equitable interest cannot be attached, for a plain and obvious reason. It is an incorporeal right, not in its nature tangible, and cannot be attached and taken into the custody of the law.
The cestui que use was no longer tenant of land at law, nor was the land liable to be subjected to his encumbrances, as dower, executions, &c. 1 Bl. Rep. 135.
An ejectment will properly lie for nothing of which the sheriff cannot deliver possession under an execution ; therefore, incorporeal hereditaments, things lying merely in grant, qua nec tangí nee mderi possunt, are not properly objects of this action. The reason is, because they cannot be taken in execution. Esp. 427. Bull. 99.
As to the question whether the legislature of Maryland had any jurisdiction over the district or territory of Columbia, at the time of passing the act of 1795, under which this attachment has issued.
In considering this question it is proper to take into view the 8th sect, of the 1st arÁ -le of the constitution of the United States, the acts of the assembly of 3Iary-land., and the acts of congress..
By the constitution, congress is to exercise exclusive legislation over such district, as by cession of particular states, and acceptance by congress, may become the seat of government of the United States.
By the act, of congress in July, 1790, a district of territory to be located (Columbia) is accepted for the permanent seat of government.
By the act of assembly, 1791, c. 45. a cession is made of the part of Columbia within this state, pursuant to the constitution of the United States, with a proviso that the jurisdiction of the laws of this state over the persons and property of individuals residing within the limits of the cession aforesaid, shall not cease or determine until *558 congress shall bv law provide for the government thereof, in manner provided by the constitution.
^ ^aw congress accepting the cession, there is a proviso that the operation of the laws of the state within such district shall not be affected by the acceptor until the time fixed for the removal of the government thereto, and until congress shall otherwise by law provide.
By the 5th section of the said law, the city of Philadelphia is made the temporary seat of the government until the first Monday of December, 1800.
By the 6th section, on the first Monday in the year 1800, the seat of the government of the United States shall be transferred to the district of Columbia, and all offices attached to the said seat of government shall be removed thereto, and cease to be exercised elsewhere after the said day.
It is plain, upon considering the article of the constitution of the United States which relates to this subject, with the law of congress, that the district of Columbia cannot become the seat of the government of the United States until the first I^onday in December in the year 1800, and it is equally plain that the laws of the state within such district shall not be affected until the said time, and until congress shall otherwise provide.
It is undeniable that congress cannot exercise exclusive legislation over the said district until it becomes the seat of government. The act of assembly of this state making the cession, must receive such construction as will correspond with the plain intent and meaning of the constitution of the United States and the law of congress ; wherefore the court are of opinion, that the jurisdiction of the state of Maryland, and of its laws over such part of the district of Columbia as lies within the limits of the state, will not cease and determine before the first Monday in December, in the year 1800. Another reason may be subjoined in support of this opinion. *559 of the court. 1'he legislature of Maryland could not transfer or suspend the power of legislation over the said part of the district which lies within the limits of the state but in pursuance of, and in conformity to, the constitution of the United States, under which alone such power of transmitting or suspending the legislative authority is derived.
The returns made upon the said attachments by the sheriffs of Prince Geo>ge's and Frederick counties were quashed by the court.
Three bills of exceptions were taken.
First exception. In the case of the return from Prince George's county, the plaintiff offered in evidence a deed to Robert Morris and John Nicholson, for the lands and tenements mentioned in the return from James Greenleaf, dated the 13th of May, 1796, being for a number of square lots in the city of Washington, in the county of Prince George's, to be held by them as tenants in common, and not as joint tenants, subject to liens created by mortgages.
Whereupon the plaintiff, William Campbell, prayed judgment that a moiety of all the following lands and tenements mentioned in the return of the sheriff of Prince George's county, on the attachment issued in this cause, should be condemned to satisfy the debt aforesaid of the said William, Campbell.
The defendant, to show that the said William Campbell, the plaintiff, was not entitled to the judgment aforesaid, offered in evidence to the court, the attested copy of a deed from the said Robert Morris, John Nicholson and James Greenleaf, to Thomas Law, dated the 4th September, 1795, conveying the said squares, among others, to the said Thomas Law, and which said deed recites that Morris, Nicholson and Greenleaf were jointly and severally bound to Thomas Law, in the sum of 100,000/. Pennsylvania currency, with a condition to convey *560 2,400,000 square feet of land in the city of Washington to secure the payment of which money, or the convey* ance sa^anc^ deed, by way of mortgage, was executed.
The defendant also offered in evidence three other deeds, one from James Greenleaf to John Nicholson, dated the 6th of August, 1795, for sundry lots in the city of Washington, subject to mortgages made to Thomas Law. One other deed from James Greenleaf to Robert Morris, dated the 7th of August, 1795, for sundry lots in the city of Washington; and another deed from the said James Greenleaf to the said Robert Morris, for sundry lots in the city of Washington, subject to mortgages to Thomas Law and Wihiam, M. Duncanson.
The plaintiff then offered in evidence to the court, a deed from Thomas Law to Robert Morris, John Nicholson and James Greenleaf dated the 5th of October, 1797, being a release of sundry squares, Jots, &c. in the city of Washington, before then mortgaged to secure the payment of 100,000/. Pennsylvania currency, or to convey 2,400,000 square feet of land in the city of Washington.
The defendant then offered in evidence to the court, a deed from Robert Morris, John Nicholson and James Greenleaf, dated the 26th of June, 1797, conveying to Henry Pratt, Thomas Francis, John Miller, John Ashley and Jacob Baker, all interest and estate of Robert Morris, John Nicholson and James Greenleaf, in the squares mentioned. The defendant then offered evidence that William Hammond Dorsey, Esq. who was authorized to protect the interest of the said Pratt, Francis, Miller, Ashley and Baker, in the aforesaid property, did, before the execution of the deed from Thomas Law> give notice to him that the said deed had been executed 'to the said Pratt, Francis, Miller, Ashley and Baker, and cautioned the said Law not to execute the said deed; but the said Law said, that the making of the deed, thereby rendering the said property liable to the attachment of *561 the plaintiff, would tend to the improvement of the New-Jersey avenue, as the plaintiff had promised to expend a sum of money thereon, provided he succeeded in the said attachment. That the said Morris, Nicholson and Greenleaf were, at all the times aforesaid, absent out of the state, and had no person authorized to accept of any deed in their name.

Whereupon the Court

(Chase, J. and Duvall, J.)
were of opinion, that the said Robert Morris had not such an estate in any of the squares above mentioned, whereof the plaintiff could have judgment of condemnation. To this opinion the plaintiff excepted.
Second exception. In the case of the return from Prince George’s county, the plaintiff showed in evidence the deed to Robert Morris and John Nicholson, from James Greenleaf of all the lands and tenements in the return in this case ; and prayed'judgment that a moiety of all the lands and tenements mentioned in the return of the sheriff of Prince George’s county onxthe attachment issued in this cause, should be condemned to satisfy the debt aforesaid.
The defendant, to show that the plaintiff was not entitled to the judgment aforesaid, offered in evidence to the court, the said deed from Robert Morris, John Nicholson and James Greenleaf to Thomas Law, dated the 4th of September, 1795, which deed conveys the squares mentioned in the return. The defendant also read the three deeds mentioned in the first exception from Green-leaf to Morris and Nicholson.
Whereupon the Court (Chase, J. and Duvall, J.) were of .opinion that Robert Morris, the defendant, had only an equitable "interest, and not such an estate in the lands and tenements mentioned in the return aforesaid, and of *562 which judgment is prayed, whereof the said William Campbell can have judgment as aforesaid ; and the said court did so adjudge and determine.

In the Court of Appeals.

Shaafffor the plaintiff in error.
This appeal arises on an attachment issued by the chief justice of the general court on the 20th oí April, 1797. There were duplicate attachments, and among others to Prince George’s and to *563 Frederick counties; upon the return of which all the present questions have arisen.
*562 To this opinion the plaintiff excepted.
Third exception. In the case of the return from Fre~ derich county. The plaintiff prayed judgment that all the lands and tenements mentioned in the return of the sheriff of Frederick county, on the attachment issued in this cause, may be condemned to satisfy the debt aforesaid of the plaintiff.
The defendant, to show that the súdWilliam Campbell was not entitled to the judgment aforesaid, offered in evidence a patent under the great seal, dated the 12th of April, 1787, to a certain John Harvie, granting unto him lots mentioned in the return of the said attachment; and also another patent dated on the 12th of November, 1787, to Joseph Wood, granting lot No. 85. also mentioned in the said return. The plaintiff offered no further evidence deriving title to the defendant from the patentees.
Whereupon the Court, (Chase, J. and Duvall, J.) having read the said patents, were of opinion, and so adjudged, that the said Sobert Morris had not such an estate in the said lands and tenements, whereof the said William Campbell could have judgment of condemnation as aforesaid prayed.
To this opinion the plaintiff excepted.
The plaintiff brought a writ of error, and the proceedings were removed to the court of appeals.
*563 In the case of the attachment from Prince George’s, the process was laid on certain property in the district of Columbia, and returned as the land and tenements of Robert Morris.
On calling the attachments Robert Morris was permitted to appear, and alleged that-'he was a citizen of Pennsylvania, and the plaintiff a citizen of Maryland; that by the constitution and laws of the United States> his lands, &c. ought not to have been attached; that by the act of assembly under which the attachment issued, it could not affect any property in the district of Columbia ; that he had no legal estate in any of the property attached, either in Frederick or Prince George’s county, but only an equity of redemption.
Both these attachments were quashed by the court.
Robert Morris, to show that he had only an equitable interest, produced a deed from Morris, Nicholson and Greenleaf, to Thomas Lazo, dated the 4th of September, 1795, mortgaging this property to Law. There are three other deeds from James Greenleaf to John Nicholson, and Robert Morris, separately, dated the 6th and 7th of Augustj 1795, which it is not necessary to state or consider, as the principles upon which the propriety of the court’s opinion must depend, are involved in the consideration of the deeds from Morris, Nicholson and Green-leaf to Law.
The plaintiff below showed a deed from James Green-leaf to Robert Morris and John Nicholson, dated the 13th of May, 1796, for all the property in question; also a deed from Thomas Law to Morris, Nicholson and Green-leaf, releasing a great part of the property, dated 5th October, 1797.
Morris offered a deed from Morris, Nicholson and Greenleaf, to Henry Platt arid others, dated 26th of July, 1797, for all their interest in the property in question; *564 that they gave notice to Law that this deed had been executed, and that he said that the plaintiff had agreed to spend money in case he succeeded in the attachments, on the New-jfersey avenue, and that Morris, Nicholson and Greenleaf.\ at that time, resided out of the state, and had no person to receive the deed.
On the return of the attachment from Frederick county, Morris showed a patent for the land to another person* and the plaintiff did not derive any title from the patentee.
In this case the court were of opinión that Robert Morris had not such an estate whereof condemnation could go; that Robert Morris had only an equitable interest, not liable to attachment; that the attachment from Frederick should be quashed, because the plaintiff did not show a title in Morris, from the patentee ; to which opinions of the court, separate exceptions were taken. The propriety of the opinion of the general court will depend on the decision of four different questions.
First. Can the act of 1795, c. 56. have the effect to make the property in this state, of a citizen of a different state, liable to attachment, in a case where the property of a citizen of Maryland would not be ?
Second. Is property in the territory of Columbia belonging to Robert Morris, not residing in the state, attachable since the act of 1791, c. 45.?
Third. Can the court, on the attachment, examine into the title on the showing of Robert Morris?
Fourth. Is the interest of Robert Morris, in the property attached, liable to an attachment ?
On the first point it must be observed, that this law makes a distinction between our own citizens and others, in this, that an attachment cannot be obtained against a citizen of Maryland, who is out of the state, unless he .has absconded from justice, whereas one may be had against a citizen cf any other state, who does not reside *565 here; and hence they contend for the defendant that this law is repugnant to the 4th article of the federal constitution, sec. 2. by which it is declared, “ That the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.”
The object of the convention in introducing this clause into the constitution, was to invest the citizens of the different states with the general rights of citizenship; that they should not be foreigners, but citizens. To go thus far was essentially necessary to the very existence of a federate government, and in reality was no more than had been provided for by the first confederation in the fourth article.
But it never could have been the intention of the framers of our national government, to melt down the states into one common mass; to put the citizens of each in the exact same situation, and confer on them equal rights : this principle would have Keen wholly destructive of the state governments.
The expressions, however, of the fourth article convey no such idea. It does not declare that “ the citizens of ea'ch state shall be entitled to all privileges and immunities of the citizens of the several states.” Had such, been the language of the constitution, it might, with more plausibility, have been contended that this act of assembly was in violation of it; but such are uot the expressions of the article; it only says that “ The citizens of the several states shall be entitled to all privileges and immunities of citizens in the several states.” Thereby designing to give them the rights of citizenship, and not to put all the citizens of the United States upon a level; consequently, the injury, as to the effect of a law of any state, will not be whether it makes a discrimination between citizens of the several states; but whether ■it infringes upon any civil right, which a man as a member of civil society must .enjoy. In the present case we *566 must inquire whether the law of 1795, c. 56. takes from Robert Morris any of the privileges of a citizen.
It is difficult to conceive how the act of assembly can have such an effect; how the general provisions of the law can do injury or injustice to any man. To be sure, in particular instances, like all general regulations, it may effect injustice.
A man who resides out of the states, would have a complete exemption from his creditors as to his property in this state, if it was not liable to attachment. He cannot be arrested because no process of the state can reach his person. This property, the only fund for the payment of debts, would be protected, if in such instances as this it may not be seized on attachment, or some other process of a similar nature. If resident in any part of America, he may be proceeded against in the federal courts, but if out of the United States, there would be no remedy.
This act of assembly can never be in violation of a man’s civil rights, until it is proved that to make his property liable for the payment of his debts constitutes the violation.
In the present instance the interest of the absent-person is abundantly protected by the provisions of the law. A writ must issue at the time of the attachment, to which the defendant may appear and dissolve the attachment; if he neglect to appear, the property is condemned and sold on •a. fieri facias ; he has a year to come in after the attachment, and controvert the propriety of the claim. Can a law of this nature be considered as infringing on the rights or privileges of a citizen ? If it were' so, a knave could secure his property against all the authority of the government.
If the state, at the adoption of the general government, ought to have retained any portion of independent power, it should be that of legislating on the subject of its own jurisprudence, and the manner of proceeding ia courts of justice ; the goodness or badness of the pro» *567 visions made on those subjects, is for the legislatures to decide ; the execution of the laws only remains for the > courts. The obvious necessity of some mode to recover . . debts from an absent person, has given rise to the different attachment laws of this state. The law of 1/15, c. 40. requires the return of non est, against a non-resident, before an attachment can be obtained; this will take in our own citizens, provided they reside out of the state. The act of 1/95, c. 56. does not authorize an attachment against a citizen of Maryland, unless he absconds from justice, but gives remedy against “ any other person not being a citizen of this state, and not residing therein.” This expression affects citizens of other states. In this way has the assembly thought proper to legislate on this subject; they have made the mode of recovery somewhat more dilatory against the citizens of our own state, than against those of other states; still there is no infraction of the privileges and immunities of a citizen, and, of consequence, no violation of the fourth article of the federal constitution.
2d point. It will only be necessary to have recourse to the acts of congress, and of the Maryland legislature, to form a proper opinion on this subject. /
By the act of congress 1/90, c. 28. a district not exceeding ten miles square, &c. was accepted for the permanent seat of government, “ Provided that the operation of the state laws within the district, shall not be affected by the acceptance until the time fixed for the removal of congress thereto, and until congi-ess shall otherwise provide.” The time fixed for the removal of congress is the first Monday of December, 1800.
After the location of this district was made, the legislature of Maryland made a final cession of that part of the district which was in this state, by the act of 1/91, c. 45. with a proviso,££ That the-jurisdiction of the laws 'if the state, over persons residing within the limits of *568 the cession, shall not cease until congress shall by law Provide for the government thereof,” &c.
Under this law a difficulty was stated in the trial of this cause, that as the act of assembly only excepted the jurisdiction of the laws of this state as to the property and persons of those who resided in the limits of the cession, it did not authorize the proceedings against the. property of Robert Morris within the territory of Columbia, as he did not reside there.
To refute this objection it is only to be observed, that the law of congress of 1790, c. 28. expressly provides that the operation of the state laws shall not be affected within the district until the time fixed for the removal of congress ; so that even if the legislature of Maryland could have designed to go further, yet this law of congress would not have authorized a cession so as to prevent the operation of the state laws before the limited time. The inconvenience of such a construction is such as to prevent it from obtaining, because, until the time fixed for the removal, congress cannot legislate for the territory, and this interpretation goes to limit to a certain extent the power of the state legislature.
On these two points I shall make no further remark ¿ the general epurt, on full argument, having determined both of them in favour of the appellant.
3d point. The proceedings under the law of 1795 are to b# regulated by that of 1715, by which law the property attached is to be condemned unless the defendant shall appear, or the garnishee in whose hands the goods are attached, to show cause to the contrary.
Both the defendant and the garnishee are by this law permitted to appear, though the manner and terms of their appearing are very different, and each must be in a legal mode. The defendant can appear to the action, but his appearance can only be by giving bail, which dissolves the attachment. The garnishee may appear to the attachment, because he is a party to it.
*569 The different interest and situation of the garnishee and the defendant plainly point out that part of the proceeding to which each are entitled to appear. The defendant, being the original debtor and the party to the action, he is authorized to appear to it and to controvert the demand, but in this respect he is in the same situation of all other defendants, that is, he will not be received into court except on the ordinary terms of giving bail. This is the acknowledged law as to the appearance to the action. Let us see what propriety there is in the defendant’s appearing to the attachment. It can never be for the purpose of showing that no debt was due to the plaintiff j since the proper way of doing that is by an appearance to the action. Shall he, then, be permitted to show that the property attached did uot belong to him ? I contend not, and for this obvious, reason, because, if the property belongs to another, the defendant is not interested to protect it, being, as to that, a stranger, and will not be heard in court to make such a defence.
The garnishee stands on different ground; his interest wholly lies in ^protecting the property attached, and, of consequence, must have an opportunity of appearing to the attachment, and controverting the title of the defendant to the subject attached in his hands.
I am confident in saying that these ideas of appearing to the action and attachment, are warranted by the usage on the occasion; for no instance until the present decision can be shown, either from our own records or from the proceedings of the English courts, in which the judges have ever permitted a defendant in the action to appear to the attachment, and plead or show that the property attached did not belong to him; yet this the general court has done in this case, Robert Morris being permitted to show that he had no legal estate in the property attached.
*570 There is a great, and, to my mind, an unanswerable, objection to a court examining into a title in this summary way, on the ground that not the court but the jury are the legal and only judges of a great variety of facts which might and must occur on this trial; for if the court is the proper tribunal to decide in the present case, it must be so in all others.
It can readily be seen that if the court undertakes to. examine into a title in this way, some of the 'most disputed points of fact will often come before them. For example ; if the property attached is held by a defendant as heir at law, the pedigree, descent, seisin in his ancestor, and his title, may have to be inquired into. The defendant may allege that the land attached is swallowed up in elder surveys ; to combat which allegation, all the intricacies of location must be examined. Or, to bring the example more immediately to the bar; suppose the defendant was to show title out oí himself, by setting up a mortgage, as is done here, which was stated by the plaintiff to be fraudulent or usurious, and, therefore, void; would the court, under such circumstances, without the assistance of the jury, go into the examination of the fraud, or of a fact so difficult to unravel as a usurious contract ? Yet these, and many otber instances of a similar nature, might happen in which the court would be obliged to act, if the principle was once admitted that the court, on these occasions, are to examine into the title.
Parol evidence was received in the present case, on behalf of the defendant, to show that Morris, Nicholson and Greenleaf had no one in the state to receive the conveyance. That the plaintiff had agreed to lay money out on the New-Jersey avenue, &c. i cannot tell what effect this testimony had on the determination, but the only tendency it could have was to show a collusion between Law and the plaintiff. This might have been controverted, and it would open a vast fund of investiga,-. *571 tion, proper for the decision, not of the court, but of a jury.
if I am correct in these observations, the court below have erred in undertaking to judge of these facts, and no inconvenience could have ensued to the true owner of the property by pursuing a different course. The return of the sheriff states the property to be the lands and tenements of Robert Morris. This afforded the court a sufficient ground to proceed to condemnation j and I do not think that the court ought to have gone further than the return of the sheriff to examine into title. That was not the proper stage to make such an investigation.
After the condemnation it is well known that the property must be sold under a fieri facias, and from the proceeds the debt is to be paid. Under such a sale the vendee, if possession is withheld, must bring his ejectment, when the title derived under the attachment will fee examined into by the proper tribunal, a jury, in which, if the defendant had no title, the purchaser under the fieri facias can have none.
If a sheriff sells a term for years under a fierifacias^ he cannot turn the defendant out of possession, but the vendee must bring his ejectment. 2 Bac. Abr. 332. 2 Show. 85.
4th point. Admitting the propriety of Robert Morris coming in to show title out of himself, it will remain for me to prove that he has such a title in the property as may be taken by this process.
I have not been able to discover, from the books, that on the return of an execution any defendant has been received to say that he had only an equity of redemption, and move to quash the execution on that ground. It is, at least, an ungracious defence for a man to make, to say that although he has the beneficial interest in property, (for such is the equity of redemption,) yet it ought not to be applied to the payment of his just debts,
*572 Upon a general view of the subject, every reason drawn from convenience points out the evident propriety of making all the property a man has, liable to the p ayment of his honest debts. We all know that in reality the mortgagor has the interest in the land, and the mortgagee only a security on it for the amount of his debt; and although a mortgage estate of 10,000/T is legally forfeited for non-payment of five pound, yet the mortgagor' has an actual interest in it to the amount of 9,995/. Ought not this interest to be subject to the execution of his creditor i
The extent of the principle, that nothing short of the complete legal estate is liable to execution or attachment, (for they are, as to this, the same,) will be found to be productive of more universal evil tendency than may at first be supposed. In the great number of conveyances of land in this state, we too often are sensible how many of them are defective, in which the grantees have no more than equitable interests. It is impossible to draw the line. If an equity of redemption is not liable to an execution or attachment, no other estate of an equitable nature can be so; and by this means all the real property in the state, the possessors’ title to which is legally defective, whether from inartificial conveyances, or in any dtber way, is locked up from the execution of their creditors.
However, I do not think that this part of the case wholly rests on this point.' I consider that Robert Morris had a legal estate in the property attached.
The deed by which Robert Morris alleges he had only an equity of redemption, is the deed from Morris, Nicholson and Greenlecif, to Law, dated 4th September, 1795, which recites that a bond in the penalty of 100,000/. and dated 3d December, 1794, to have been given to convey 2,400,000 square feet of land in the territory of Columbia, and that by another agreement of the 10th March, *573 1795, it was agreed that the grantees should mortgage certain squares in the city until they could give good titles to Law for such property as he might select, and the mortgage given to Law of the 4th September, 1795,. is to be defeasanced on payment of the 100,000/. or if the grantees should, in compliance with the bond of 1794, and the agreement of the 10th of March, 1795, convey 2,400,000 feet of land, &c. and the grantor, Law, covenanted, granted and agreed, that the grantees and their assigns, should have, hold and enjoy the premises, unless they made a default in the condition.
This is a mortgage to secure the conveyance of other property, in which the parties have covenanted, and granted, that the mortgagors shall hold and enjoy the premises, unless in case of failure. This covenant and grant gives the legal estate to the mortgagors until'such failure takes place, and is distinguishable from those cases wherein the mortgagee only covenants that he will not molest the mortgagor in the enjoyment.
A mortgage was made with an agreement that the mortgagee should not intermeddle with the actual possession of the premises until default of payment, which was at the distance of some years. It was held that the mortgagor was tenant at will; distinction being taken between this agreement, and one that the mortgagor should enjoy it during those years, for the latter would have been a lease for years. Pow. on Mart. 67. This case is taken by Powell from 2 Cro. 659. where it seemed to be admitted that an agreement that the mortgagor should enjoy the premises until default of payment, would have been a lease for years, although the court did not decide the question.
If a grant of this nature in a mortgage deed did not continue the legal estate in the mortgagor, the greatest inconvenience would ensue. Suppose, by way of example, a deed of mortgage was made redeemable on payment of a sum of money at the distance of fifty years. *574 and that the mortgagor should retain possession in the mean time, has he not a complete estate for fifty years l And shall not that estate be answerable for the payment of his debts, and the execution of his creditors ?
But there is another ground on which I think this property attachable; I mean in consequence of the deed from Law to Morris, Nicholson and Greenleaf. dated the 5th of October, 1797, although subsequent to our attachment.
The embarrassment arises from confounding the attachment with the commencement of á suit. It is more like an execution. In an action, if-there is no cause at the commencement of it, the suit c.rnnot be supported; but the judgment may be served out of any property coming to hand even after judgment. So it is with an attachment. If the party has property after the levying the attachment it will do.
If there was no other argument or authority, the terms of proceeding would alone determine it. The garnishee always pleads that he had no goods, &c. at the time of the attachment, or ever after. On this the issue is joined, and if it be proved that he had goods at the time of the plea, it will be sufficient for the plaintiff. It will be found that in every instance where the garnishee had pleaded nulla bona, the plea has been in that way. How, then, can it be material whether the party had effects at the time of laying the attachment. It is well known that our attachment laws are taken from “ the foreign attachment” in London, and that the construction of our laws has been much governed by the decision of the courts on the foreign attachment. Let us, then, see how the law stands in that case.
“ If A. attach the goods or money of M. in the hands of R. and if R. had no money or goods in his hands belonging to M. at the time when the attachment shall be made, and it shall happen that six months after R. shall be indebted to M. or have goods of him in his hands, *575 the plaintiff A. by virtue of the attachment made as aforesaid, shall recover the goods or money he shall prove to come to the hands of JR. after the attachment, the general issue being whether B. who is called the garnishee, at the time of the attachment, or ever after, had any money or goods in his hands.” Pow. Lond. 255. 261.
This authority fully proves that it is not necessary that a garnishee should have any property in his hands at the time the attachment is laid. So, I argue in the present case, it is not necessary that Robert Morris should have any property, that is, any legal estate, in the subject attached, at the time of laying the process. Certain specified lands, &c. are taken, attached and returned as such by the sheriff, and if at any time afterwards the defendant has such legal estate, it may be condemned.
It may be contended that Morris, Nicholson and Green™ leaf have conveyed their interest in the property in question to others, on the 26th day of fune, 1797, and given Law notice of such conveyance, and as they had no person in this state authorized to receive a deed, and they being non-residents, the deed was inoperative. It must be remembered that this deed of the 26th of fune, 1797, was subsequent to our attachment; but taking all the evidence as properly received by the court, which I have endeavoured to show is not the case, yet it does not prove a refusal on the part of the grantees to abide by the deed, which is essentially necessary to prevent its operation.
If a charter of feoffment was made to four, and seisin delivered to three in the name of all, and after the seisin was given, the fourth saw the deed, and by word disagreed to the deed, it was adjudged that this disagreement by word in pais should not devest the freehold out of him. 3 Co. 26.
If A. makes an obligation to B. and delivers the deed *576 to the use of B., it is the deed of A. presently, but B. may refuse the same in pais. Same law of goods and chattels; if the deed be delivered to the use of the donee, the goods and chattels are in the donee presently before notice or agreement, but he may refuse in pais. 3 Co. 26.
An estate created by feoffment, &c. can be waived in pais, no more than such an estate created by limitation of use. 3 Co. 27.
I have taken the words of Coke, and shall make no observations on them, as they fully prove that land may be conveyed, and will pass to the grantee by a deed delivered to his use, although he has had no previous notice of it; he may surely refuse to stand to the deed, but he must do it in a proper manner.
If the court should differ in opinion with the general court, it will then become necessary, on the reversal of their judgment, for this court to go on and give the judgment which the Gourt below ought to have given, that is, a judgment of condemnation, it being a well known principle, and the practice has been conformable to it, for the appellate court not only to reverse the judgment where there is an error in it, but to go further and give the legal judgment.
The Court of Appeals reversed the judgment of the general court at June term, 1800, and gave a judgment of condemnation.